JOHN A. SHOPE (admitted *pro hac vice*)
KEVIN J. CONROY (admitted *pro hac vice*)
**FOLEY HOAG LLP**
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
jshope@foleyhoag.com
kjconroy@foleyhoag.com

DAVID M. GOLDSTEIN (State Bar No. 142334)
DAVID C. BROWNSTEIN (State Bar No. 141929)
CHARLES R. JAEGER (State Bar No. 171039)
**FARMER BROWNSTEIN JAEGER & GOLDSTEIN LLP**
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 795-2050
Facsimile: (415) 520-5678
dgoldstein@fbj-law.com
dbrownstein@fbj-law.com
cjaeger@fbj-law.com

Attorneys for Defendant
ZUMPER, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| LUIS ARMANDO GONZALEZ-TORRES, on behalf of himself and all others similarly situated,<br><br>                         Plaintiff,<br><br>         v.<br><br>ZUMPER, INC.,<br><br>                         Defendant. | **Case No. 4:19-cv-2183-PJH**<br><br>PROPOSED CLASS ACTION<br><br>[Assigned to the Hon. Phyllis J. Hamilton]<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>**Hearing Date and Time:**<br>**Date:** July 31, 2019<br>**Time:** 9:00 a.m.<br>**Courtroom:** 3<br><br>**Complaint Filed:** April 23, 2019<br>**Trial Date: None** |

## NOTICE OF MOTION AND MOTION

**TO THE COURT, PLAINTIFF AND HIS ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on July 31, 2019, at 9:00 a.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Phyllis J. Hamilton, United States District Judge, Northern District of California, located at 1301 Clay Street, Oakland, California 94612, defendant Zumper, Inc. will and hereby does move pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* (the "FAA"), for an Order compelling plaintiff Luis Armando Gonzalez-Torres to arbitrate his claims and to stay the action pending the outcome of arbitration and this motion.

Mr. Gonzalez-Torres explicitly agreed to arbitrate with Zumper when he created an account and used Zumper's apartment rental website on February 27, 2018, and again on May 10, 2018 when he signed into his account and made further use of the website to request additional background reports at issue in this case. The broad arbitration agreement encompasses all disputes arising out of or relating to Zumper's website and the services offered thereon. Mr. Gonzalez-Torres' claims in this case fall squarely within the scope of the parties' arbitration agreement. Under the FAA, the Court must therefore compel arbitration and stay this action pending the outcome of arbitration.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of Brian Coyne, all pleadings and files in this action, all matters of which this Court may take judicial notice, and upon such other and further oral or documentary evidence as may be presented to the Court at or prior to the hearing on this Motion.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

DATED:  June 17, 2019

Respectfully Submitted,

By:    /s/  John A. Shope

John A. Shope (admitted pro hac vice)
Kevin J. Conroy (admitted pro hac vice)
**FOLEY HOAG LLP**
155 Seaport Boulevard
Boston, MA 02210-2600
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
jshope@foleyhoag.com
kjconroy@foleyhoag.com

David M. Goldstein (SBN 142334)
David C. Brownstein (SBN 141929)
Charles R. Jaeger (SBN 171039)
**FARMER BROWNSTEIN**
**JAEGER & GOLDSTEIN LLP**
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 795-2050
Facsimile: (415) 520-5678
dgoldstein@fbj-law.com
dbrownstein@fbj-law.com
cjaeger@fbj-law.com

Attorneys for Defendant Zumper, Inc.

Case No. 4:19-cv-2183-PJH

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

## <u>TABLE OF CONTENTS</u>

Memorandum of Points and Authorities ............................................................. 1

Introduction ....................................................................................................... 1

Issue Statement (N.D. Cal. Civ. L.R. 7-4(a)(3)) ............................................. 2

Facts and Procedural Background .................................................................... 2

    The Plaintiff Created a Zumper Account ...................................................... 2

    Plaintiff's Subsequent Site Visit Confirmed His Creation of an Account ........ 5

    By Creating a Zumper Account, the Plaintiff Agreed to Arbitrate .................. 6

    The Plaintiff's Claims .................................................................................. 8

    Procedural History ....................................................................................... 9

Argument .......................................................................................................... 9

I.     THE FEDERAL ARBITRATION ACT REQUIRES ENFORCEMENT OF
         AGREEMENTS TO ARBITRATE. .......................................................... 9

II.    GONZALEZ-TORRES AGREED WITH ZUMPER TO ARBITRATE. ....... 11

    A.    Choice of Law. ................................................................................. 11

    B.    Zumper's Account Creation Process Formed a Binding Contract ........ 12

         1.    Law Governing Website Contract Formation. ........................... 12

         2.    Gonzalez-Torres Had at Least Constructive Knowledge of
              Zumper's Terms and Took an Affirmative Act Indicating His
              Agreement to Them. ................................................................ 13

         3.    The Second Circuit Has Held that Parties Made a Valid Contract in
              Nearly Identical Circumstances. .............................................. 14

         4.    District Courts in this Circuit and Elsewhere Enforce Similar
              Agreements. .......................................................................... 17

         5.    Zumper's Website Design Does Not Have the Fatal Flaws Found
              in Other Cases. ...................................................................... 20

    C.    The Plaintiff Reaffirmed His Agreement to the Terms in May 2018. ..... 22

III.   THE AGREEMENT TO ARBITRATE COVERS THE PLAINTIFF'S CLAIMS. ........ 23

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

A.  Any Objection to the Scope of Arbitration Must Be Submitted to the Arbitrator........................................................................................ 24

B.  The Claims Are Plainly Within the Scope of the Arbitration Clause. .................. 24

IV.  THE FAA MANDATES THAT THIS ACTION BE STAYED PENDING ARBITRATION. ................................................................................ 25

Conclusion ............................................................................................ 25

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

# **TABLE OF AUTHORITIES**

## **Cases**

*5381 Partners LLC v. Shareasale.com, Inc.*,
  2013 U.S. Dist. LEXIS 136003 (E.D.N.Y. Sept. 23, 2013) ..................................... 20

*Allied-Bruce Terminix Cos. v. Dobson*,
  513 U.S. 265 (1995) ..................................... 10

*Am. Express Co. v. Italian Colors Restaurant*,
  520 U.S. 228 (2013) ..................................... 9

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ..................................... 9

*Berkson v. GoGo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) ..................................... 17, 22

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) ..................................... 24

*Cullinane v. Uber Techs., Inc.*,
  893 F.3d 53 (1st Cir. 2018) ..................................... 21, 22

*Dean Witter Reynolds, Inc. v. Byrd*,
  470 U.S. 213 (1985) ..................................... 10, 25

*DIRECTV, Inc. v. Imburgia*,
  136 S. Ct. 463 (2015) ..................................... 9

*Div. of Labor Law Enf't v. Transpacific Transp. Co.*,
  69 Cal. App. 3d 268 (Cal. App. 1977) ..................................... 12

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938 (1995) ..................................... 11

*Fteja v. Facebook, Inc.*,
  841 F. Supp. 2d 829 (S.D.N.Y. 2012) ..................................... 18

*Heim v. Estate of Heim*,
  2012 U.S. Dist. LEXIS 40225 (N.D. Cal. Mar. 23, 2012) ..................................... 11

*Hubbert v. Dell Corporation*,
  835 N.E.2d 113 (Ill. App. Ct. 2005) ..................................... 17

*In re Facebook Biometric Info. Privacy Litig.*,
  185 F. Supp. 3d 1155 (N.D. Cal. 2016) ..................................... 12, 17

*Kinko's, Inc. v. Payne*,
  901 So. 2d 354 (Fla. Dist. Ct. App. 2005) ..................................... 13

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941) ............................................................................................ 11

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407, (2019) ...................................................................................... 9

*Lifescan, Inc. v. Premier Diabetic Servs.*,
    363 F.3d 1010 (9th Cir. 2004) .......................................................................... 10

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017)...................................................... 12, 14, 15, 16, 17, 19

*Nguyen v. Barnes & Noble Inc.*,
    763 F.3d 1171 (9th Cir. 2014) ..................................................................... 12, 20

*Nicosia v. Amazon.com, Inc.*,
    2019 U.S. Dist. LEXIS 100162 (E.D.N.Y. June 14, 2019) ................................. 19

*Payne v. Amazon.com, Inc.*,
    2018 U.S. Dist. LEXIS 135020 (D.S.C. July 24, 2018) .............................. 17, 22

*PDC Labs., Inc. v. Hach Co.*,
    2009 U.S. Dist. LEXIS 75378 (C.D. Ill. Aug. 24, 2009)................................... 20

*Robbie v. Miami*,
    469 So. 2d 1384 (Fla. 1985) ............................................................................ 12

*Roth v. Malson*,
    67 Cal. App. 4th 552 (Cal. App. 1998) ........................................................... 12

*St. Joe Corp. v. McIver*,
    875 So. 2d 375 (Fla. 2004).............................................................................. 12

*Sanchez v. Gruma Corp.*,
    2019 U.S. Dist. LEXIS 60885 (N.D. Cal. Apr. 9, 2019) ................................. 10

*Selden v. Airbnb, Inc.*,
    2016 U.S. Dist. LEXIS 150863 (D.D.C. Nov. 1, 2016) ........................ 17, 18, 19

*Siddall v. Clark*,
    89 Cal. 321 (1891) .......................................................................................... 13

*Vitacost.com, Inc. v. McCants*,
    210 So. 3d 761 (Fla. Dist. Ct. App. 2017) ...................................................... 12

*Wash. Mut. Bank v. Superior Court*,
    24 Cal. 4th 906 (2001) .................................................................................... 11

### Statutory Authorities

9 U.S.C. § 1 ............................................................................................................. 10

9 U.S.C. § 2 ............................................................................................................. 9

9 U.S.C. § 3.................................................................................................................... 25

9 U.S.C. § 4.................................................................................................................... 10

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Defendant Zumper, Inc. operates a website that enables prospective renters to search and apply for apartments, and allows landlords and realtors to evaluate and communicate with prospective tenants.  Among other things, a prospective renter can request that Zumper obtain credit, criminal, and eviction reports generated by third parties and transmit those reports to prospective landlords.  As directed by the website, and as website user and plaintiff Luis Armando Gonzalez-Torres did here, a prospective renter begins the process by creating a Zumper account.  Before clicking on a button to do so, the user views a prominent notice that "By creating a Zumper Account you indicate your acceptance of our Terms and Conditions and Privacy Policy."  The words "Terms and Conditions" in the notice are a blue hyperlink that, if clicked, will redirect the user to Zumper's terms.  Those terms include a provision requiring that all disputes between Zumper and the user arising out of or relating to the terms, the website, and the services Zumper provides must be resolved through binding arbitration administered by the American Arbitration Association.  Similar means of making a contract, often including an arbitration clause, are employed by many other providers of web-based commerce, such as Facebook, Amazon, Uber, and Airbnb, and the resulting contracts are enforced by the courts.

Gonzalez-Torres alleges that he used Zumper's website in the process of applying to rent a home.  Zumper's records show that, after creating his Zumper account and paying a fee, Gonzalez-Torres on multiple occasions authorized the creation and transmission of credit and background checks to a realtor in Florida with respect to several properties in that state for a total cost of $60.  Gonzalez-Torres alleges that the report Zumper shared at his request contained inaccurate information.  Gonzalez-Torres further alleges that Zumper did not adequately respond after he notified Zumper of the alleged inaccuracies.  The complaint, filed as a class action, asserts four counts for alleged violations of the Fair Credit Reporting Act, and three counts for alleged violations of California's Consumer Credit Reporting Agencies Act.

1    Gonzalez-Torres formed a contract with Zumper, and the contract requires that his claims

2    be resolved through binding arbitration.  Zumper is therefore moving pursuant to the parties'

3    agreement and the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 1 *et seq.*, to compel

4    arbitration of Mr. Gonzalez-Torres' claims and to stay these proceedings pending resolution of

5    this motion and the subsequent arbitration.

**ISSUE STATEMENT (N.D. CAL. CIV. L.R. 7-4(A)(3))**

7    This motion presents the following issue:  Whether plaintiff Luis Armando Gonzalez-

8    Torres' claims must be arbitrated under the terms to which he agreed when he created an account

9    on the Zumper website.

**FACTS AND PROCEDURAL BACKGROUND**

11   **The Plaintiff Created a Zumper Account**

12   Zumper is a corporation organized under Delaware law with a principal place of business

13   in San Francisco, California.  Declaration of Brian Coyne ("Coyne Decl.") ¶ 2.  Zumper provides

14   an on-line marketplace throughout the United States and Canada in which prospective renters

15   can search for rental apartments and connect with landlords and realtors offering rental

16   apartments, and landlords can communicate with and evaluate potential tenants.  *Id.*  Zumper

17   does this through its website, www.zumper.com.  *Id.*  One of the services that Zumper provides

18   on its website is to obtain credit, criminal, and eviction reports from third parties for transmission

19   to prospective landlords when prospective tenants have so requested.  *Id.*  In order to take

20   advantage of that service, and other features of the Zumper website, a user has to create an

21   account.  *Id.* ¶ 4.

22   Gonzalez-Torres alleges that, in early 2018, he was seeking to rent a home.  Cmplt. ¶¶ 33.

23   Gonzalez-Torres alleges that the listing agent with whom he was working sent an email

24   informing him that he would need to provide a credit report and background report as part of the

25   application process.  *Id.* ¶¶ 34-35.  Gonzalez-Torres alleges that the listing agent sent him a link

26   to the Zumper website, and that on or about February 27, 2018, Gonzalez-Torres went to the

27   Zumper website and submitted a rental application, including a "Zumper Screen" report.  *Id.*

28

¶¶ 35-37.  Gonzalez-Torres alleges that he paid $30 in connection with submitting the rental application.  *Id.* ¶ 38.

These allegations are consistent with Zumper's records, which show that an individual with the name Luis Gonzalez created an account on February 27, 2018, and then submitted a rental application, including credit, criminal history and eviction reports, to a realtor.  Coyne Decl. ¶¶ 19, 24.  This user had communications with Zumper's customer service consistent with the communications that the Plaintiff alleges he had with Zumper's customer service.  *Id.* ¶ 20; *see also* Cmplt. ¶¶ 48-49, 52-56.

In order to create an account and submit a rental application, Gonzalez-Torres necessarily would have encountered a pop-up window on the Zumper website directing him to "Create Account."  Coyne Decl. ¶¶ 10, 14.  Gonzalez-Torres could have reached this window either by, as is likely, following the link provided by the realtor with whom he was working and then clicking on an "Apply Now" button, or by independently navigating to it on the Zumper website. *Id.* ¶¶ 8-10.  Regardless of the method by which he reached the "Create Account" window, its appearance would have been the same.  *Id.* ¶ 10 n.2.

Zumper's records show that Gonzalez-Torres created an account at 11:36 a.m. Pacific Standard Time, on February 27, 2018.  *Id.* ¶ 22.  Zumper's records also show that Gonzalez-Torres used a computer with the Windows 10 operating system to do so.  *Id.* ¶ 23.  An image of the account creation window, as it would have appeared on such a computer, with a browser window in landscape orientation,[1] is on the next page:

---

[1] The appearance of the "Create Account" window would have looked approximately the same even if Gonzalez-Torres were using a browser window in portrait orientation, because the "Create Account" pop up window itself is presented in portrait orientation.  Coyne Decl. ¶ 11 n.3.



*Id.* ¶ 11 and accompanying screenshot.

As it appeared in February 2018 (and throughout Gonzalez-Torres' continuing use of the site later that year), the account creation window offered prospective users two means by which to create an account. *Id.* ¶¶ 12, 34. A user could either enter his or her name, email address and password and click on a blue button labeled "Create Account," or create a Zumper account using his information in an existing Facebook account by clicking on a white button labeled "Continue with Facebook," entering his Facebook login credentials, and confirming that he wanted to continue. *Id.* ¶¶ 12-13. Zumper's records indicate that Gonzalez-Torres created his Zumper account using the latter option. *Id.* ¶ 12.

Immediately below the two buttons that allow a user to create a Zumper account was a sentence stating that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy." *Id.* ¶ 15. The words "Terms and Conditions" and "Privacy Policy" appeared in blue, whereas the rest of the sentence (including the word "and" between the two blue phrases) appeared in black. *Id.* ¶ 16; *see also id.* ¶ 11 accompanying screenshot. The

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

sentence was in the same size font as the prompts for the user's name, email address, and password, and the same size font as the dictate "Create Account" at the top of the window, although those words appeared in bold.  *Id.* ¶¶ 12, 15; *see also id.* ¶ 11 accompanying screenshot. The sentence noting agreement to the terms and conditions (and the entirety of the account creation window) was immediately visible and did not require any scrolling to read.  *Id.* ¶ 15.

The words "Terms and Conditions" and "Privacy Policy" appeared in blue to indicate to the user that they were hyperlinks.  *Id.* ¶ 16.  Clicking on "Terms and Conditions" would have caused the web browser to redirect to another page on the Zumper website (www.zumper.com/terms-of-use), where Gonzalez-Torres could have read Zumper's terms.  *Id.* ¶ 17.  (Similarly, clicking on "Privacy Policy" would have caused the web browser to redirect to yet another page on the Zumper website (www.zumper.com/privacy-policy), where Gonzalez-Torres could have read Zumper's privacy policy.  *Id.* ¶ 17 n.4.)  Furthermore, the links to both the terms and privacy policy appeared at the bottom of every page of the website.  *Id.* ¶¶ 17 & n.4.

It was Gonzalez-Torres' choice whether or not to read the terms when creating his account.  *Id.* ¶ 18.  But whether or not he chose to read them, he could not create an account until he proactively decided to click on either one of the buttons appearing directly above the hyperlinks to the terms and privacy policy and the language informing him that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy." *Id.*

**Plaintiff's Subsequent Site Visit Confirmed His Creation of an Account**

Gonzalez-Torres visited the Zumper website again on May 10, 2018 and shared another rental application with the same realtor.  *Id.* ¶ 27.  In order to complete that transaction, Gonzalez-Torres had to sign in to his Zumper account.  *Id.* ¶¶ 27-28.  After following another link from the realtor and clicking on the "Apply Now" button on the linked page, Gonzalez-Torres would have encountered the same "Create Account" window that he encountered on February 27, 2018.  *Id.* ¶ 29; *see also id.* ¶ 11 and accompanying screenshot.  Because Gonzalez-

Torres already had an account (having created one on February 27, 2018), the pertinent language in the "Create Account" window is that which appears at the bottom: "Already a Member? Sign In." *Id.* ¶¶ 30-31; *see also id.* ¶ 11 and accompanying screenshot. Again without scrolling, this language appeared directly below the language notifying users that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy." *See id.* ¶ 11 and accompanying screenshot; *id.* ¶ 32 n.5. To proceed, Gonzalez-Torres would have had to click the "Sign In" hyperlink, which would have opened a new pop-up window labeled "Sign In to Zumper," where he would have signed in with his email address and the password that he had created on February 27, 2018. *Id.* ¶¶ 31-32 and accompanying screenshot.

Zumper's records indicate that, even though he was already a member, Gonzalez-Torres attempted to use his Facebook account to sign-in on May 10, 2018. *Id.* ¶ 28. He therefore received an error message reading "A user with this email already exists." *Id.* ¶ 30. He was then required to click the "Sign In" hyperlink and sign in as outlined in the preceding paragraph. *Id.* ¶ 31. Because he was able to use the site at that time, he necessarily did so. *Id.* ¶¶ 27-28. In addition, Gonzalez-Torres used the site again to apply for an apartment on July 11, 2018, when the same screens were in place. *Id.* ¶¶ 27, 34.

**By Creating a Zumper Account, the Plaintiff Agreed to Arbitrate**

As discussed above, Zumper's records show that Gonzalez-Torres created an account on February 27, 2018. *Id.* ¶ 22. Approximately two hours after creating his account, Gonzalez-Torres used the Zumper website to submit a rental application and to share his credit and background reports with his realtor. *Id.* ¶ 24.

By creating an account, Gonzalez-Torres necessarily agreed to the terms posted on the Zumper website as of February 27, 2018. *Id.* ¶ 35. Those terms, as they existed on his dates of use of February 27, 2018, May 10, 2018, and July 11, 2018, included the following provision in Section 14 (entitled "Arbitration and Dispute Resolution"):

> All disputes arising out of or relating to this Agreement, the Website or the
> Services shall be resolved exclusively by binding arbitration before a single
> arbitrator (the "Arbitrator") in accordance with the Commercial Arbitration Rules

1   of the American Arbitration Association (the "AAA") then in effect (for
2   information on the AAA and its rules, see www.adr.org.) and the further
3   procedures set forth herein, except that each party retains the right to seek
4   injunctive or other equitable relief in a court of competent jurisdiction to prevent
    the actual or threatened infringement, misappropriation or violation of a party's
    copyrights, trademarks, trade secrets, patents or other intellectual property rights.
5   The arbitration shall be conducted in San Francisco, California, unless the
6   Arbitrator shall determine that that venue is not reasonably convenient to all
    parties, in which case the Arbitrator shall determine another venue that is. In the
7   event that the AAA is unavailable or unwilling to administer the arbitration, and
8   the parties are unable to agree to a substitute, a substitute shall be appointed by
    the court. The Arbitrator shall have authority to issue any and all remedies
9   authorized by law. The arbitration shall be governed by the Federal Arbitration
10  Act, 9 U.S.C. §§ 2 et seq. Notwithstanding any rules of the AAA to the contrary,
    any claims shall be adjudicated on an individual basis only, and YOU WAIVE
11  ANY RIGHT TO BRING ANY CLAIM AS A REPRESENTATIVE OF A
    PROPOSED CLASS, ON AN AGGREGATED OR MASS BASIS, OR AS A
12  PRIVATE ATTORNEY GENERAL, OR TO CONSOLIDATE ARBITRATION
    PROCEEDINGS WITHOUT THE CONSENT OF ALL PARTIES THERETO.
13  Any award rendered by the Arbitrator shall be final, conclusive and binding upon
14  the parties hereto. In connection with any arbitration proceeding pursuant to this
    Agreement, unless the Arbitrator shall determine otherwise, each party shall bear
15  its own costs and expenses. Notwithstanding the foregoing, you may at your
16  option file an individual claim in any small claims court for disputes or claims
    within the scope of its subject matter jurisdiction if such court has personal
17  jurisdiction. Zumper does not hereby waive any defense that such jurisdiction
    may be lacking in your state. Without derogation of the parties' obligation to
18  arbitrate as set forth herein, for any claims other than those in small claims court,
    jurisdiction for any court proceedings arising out of or relating to this Agreement,
19  the Website or the Services shall be vested exclusively in, and venue shall be laid
    in, the state or federal courts sitting San Francisco, California except that,
20  following confirmation of an arbitration award in a state or federal court in San
    Francisco, California, a judgment arising therefrom may be executed in any court
    of competent jurisdiction.

21  *Id.* ¶ 39 & Exs. C & D (emphasis in original).  The arbitration provision referenced and

22  incorporated the Commercial Rules of the American Arbitration Association, which, as indicated

23  in the agreement, are available on that organization's website, www.adr.org.  *Id.* ¶ 39 & Exs. C

24  & D.

25       Zumper's terms defined "Services," as used in the arbitration provision, as "the Zumper

26  online real estate marketplace, including the Zumper Pro Service and the Zumper Select Service,

27  offered through the Website."  *Id.* ¶ 40 & Exs. C & D.  Section 7 of the terms further specified

28

that requesting and sharing credit, criminal and eviction reports, as Gonzalez-Torres did on February 27, 2018, was part of the "Services," as defined in the agreement, providing:

> You understand that you may (i) submit electronic instructions through the Services to a Listing Party authorizing such Listing Party to obtain through services provided by one our third party service providers a copy of your consumer credit report and score, as well as reports of background investigations regarding your criminal and eviction history as each relates to your suitability as a tenant, or (ii) submit consent to a request from a Listing Party that it be authorized to so obtain such credit report and score or background investigation . . . .

*Id.* ¶ 41 & Exs. C & D.  The definition of "Listing Party" included landlords, landlord representatives, brokers, property managers, and sublessors.  *Id.* Ex. C, § 4; Ex. D, § 4.

**The Plaintiff's Claims**

Gonzalez-Torres alleges that Zumper published a consumer report that erroneously associated him with criminal offenses of an individual named Luis Raymond Gonzalez.  Cmplt. ¶¶ 40, 43.  Gonzalez-Torres alleges that this error was the result of Zumper's having used "very loose matching criteria" in preparing the report.  *Id.* ¶ 44.  Gonzalez-Torres alleges that his rental applications were denied and the inaccuracy was a "substantial factor" in the denial.  *Id.* ¶ 46. He further alleges that he contacted Zumper to dispute the entry on his criminal history report, but that he did not receive an adequate response.  *Id.* ¶¶ 48, 57.  Gonzalez-Torres alleges that he suffered damages, including lost rental opportunities, harm to reputation, and emotional distress. *Id.* ¶ 65.  He asserts claims under four sections of the Fair Credit Reporting Act and three sections of the California Consumer Credit Reporting Agencies Act.  *Id.* ¶¶ 76-96.  (Though the matter will be for an arbitrator to decide, Zumper contends that any inaccuracies are attributable to a vendor not a party to this case.)

Notwithstanding having agreed to arbitrate, Gonzalez-Torres proposes to litigate his claims in this Court on behalf of himself and on behalf of five different classes of individuals. *Id.* ¶ 69.

**Procedural History**

Gonzalez-Torres filed this action in this Court on April 23, 2019, and served Zumper on April 26, 2019.  On May 17, 2019, the parties filed a stipulation extending the time for Zumper to respond to the complaint to June 17, 2019.  Zumper has not yet answered or otherwise litigated this matter in court.  Zumper now moves to compel Gonzalez-Torres to arbitrate this dispute pursuant to the parties' agreement and to stay this case pending resolution of this motion and any subsequent arbitration.

## ARGUMENT

### I.   THE FEDERAL ARBITRATION ACT REQUIRES ENFORCEMENT OF AGREEMENTS TO ARBITRATE.

Section 2 of the FAA provides in relevant part that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  This provision reflects "a liberal federal policy favoring arbitration," and courts "must place arbitration agreements on equal footing with other contracts and enforce them according to their terms."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations and quotation marks omitted) (consumer claims arbitrable even though a class action procedure is unavailable); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (class arbitration unavailable absent unambiguous agreement to the contrary); *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) ("[C]ourts must rigorously enforce arbitration agreements according to their terms . . . ." (internal quotation marks omitted)) (enforcing clause even if claim infeasible in arbitration without class).  The Supreme Court has recently reaffirmed the need to give "due regard . . . to the federal policy favoring arbitration." *See DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471 (2015) (omission of text in original; citation omitted) (states may not apply distinct rules of contract interpretation to arbitration clauses).

1     Accordingly, Section 4 of the FAA provides in relevant part that "[a] party aggrieved by

2  the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for

3  arbitration may petition any United States district court . . . for an order directing that such

4  arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  The FAA

5  "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to

6  which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S.

7  213, 218 (1985) (emphasis in original).

8     The FAA applies in this case, because the agreement between Zumper and the Plaintiff is

9  a contract "evidencing a transaction involving commerce" within the meaning of the FAA.

10  "Commerce" within the Federal Arbitration Act "means commerce among the several States,"

11  9 U.S.C. § 1, and runs to the full extent of the Constitution's Commerce Clause.  *Allied-Bruce*

12  *Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995).  Zumper is a Delaware corporation,

13  headquartered in San Francisco, California, that does business through its website throughout the

14  United States and Canada.  Coyne Decl. ¶ 2.  Gonzalez-Torres states that he is a Florida resident,

15  Cmplt. ¶ 52, and he was seeking to rent property in Florida, Coyne Decl. ¶ 26.  The agreement

16  between the parties is unquestionably a contract involving interstate commerce.  *See Allied-*

17  *Bruce Terminix Cos.,* 513 U.S. at 282 (interstate commerce element satisfied where parties were

18  multistate firms and relevant materials crossed state lines); *Sanchez v. Gruma Corp.*, 2019 U.S.

19  Dist. LEXIS 60885, *8 (N.D. Cal. Apr. 9, 2019) (employment agreement between California

20  resident and Nevada corporation headquartered in Texas is an a "transaction involving

21  commerce" within the meaning of the FAA).

22     Courts in this circuit enforce agreements to arbitrate where:  (1) a valid agreement exists

23  between the parties to arbitrate; and (2) the agreement encompasses the dispute at issue.

24  *Lifescan, Inc. v. Premier Diabetic Servs.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  Both of these

25  elements are clearly satisfied in this case.

26

27

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

## II.        GONZALEZ-TORRES AGREED WITH ZUMPER TO ARBITRATE.

Zumper satisfies the first factor necessary to invoke the FAA because Gonzalez-Torres agreed to its terms, including the arbitration clause, when he created an account on the Zumper website.

### A.        Choice of Law.

As an initial matter, it is necessary to determine which state's law governs the question of contract formation.  Although Zumper's terms choose California law, Coyne Decl. Ex. C, § 13, if the Plaintiff disputes agreeing to those terms (as he must to avoid arbitration), there is a question of which state's law should be applied to the issue of contract formation.  Gonzalez-Torres is (or at least was at the relevant time) a Florida resident, Cmplt. ¶ 52, and his claims arise out of his use of the Zumper website to attempt to rent a home in Florida, Coyne Decl. ¶ 26.  Therefore it is necessary to consider whether Florida law applies.

Gonzalez-Torres invokes the Court's federal question jurisdiction and supplemental jurisdiction.  Cmplt. ¶¶ 4-5.  A district court sitting in federal question jurisdiction applies the choice of law rules of the forum state with respect to issues governed by state law.  *Heim v. Estate of Heim*, 2012 U.S. Dist. LEXIS 40225, *8 (N.D. Cal. Mar. 23, 2012) (citing *Paracor Fin. Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996)); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (in diversity jurisdiction, the choice of law rules of the forum state apply).  The existence of an agreement to arbitrate is an issue governed by ordinary state law.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  In the absence of a choice of law clause, California applies a governmental interest analysis to determine which state's law applies.  *See Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 919 (2001).

Were there a conflict between the relevant laws of Florida and the forum, it is likely that Florida would have the greater interest in having its own law applied to the case of a Florida resident entering into a business transaction aimed at renting real property in Florida.  There does not, however, at this time appear to be such a conflict, at least with respect to the issue of

contract formation presented in this motion.  *See Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. Dist. Ct. App. 2017) (observing the lack of Florida case law regarding to the issue of online agreements and following *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014)).[2]

**B.    Zumper's Account Creation Process Formed a Binding Contract.**

*1.    Law Governing Website Contract Formation.*

Under both California and Florida law, the essential elements of a contract are offer, acceptance, and consideration.  *See Div. of Labor Law Enf't v. Transpacific Transp. Co.*, 69 Cal. App. 3d 268, 275 (Cal. App. 1977); *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). Acceptance is determined objectively, from the party's words and acts.  *See Roth v. Malson*, 67 Cal. App. 4th 552, 557 (Cal. App. 1998); *Robbie v. Miami*, 469 So. 2d 1384, 1385 (Fla. 1985). The general principles of contract formation do not change when the contract is formed on the Internet.  *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)).  A binding contract is formed where the offeror "provide[s] reasonable notice" of the proposed terms and the user "unambiguously manifest[s] assent" to those terms.  *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1164 (N.D. Cal. 2016) (quoting *Nguyen*, 763 F.3d at 1173); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017) (applying California law); *Nguyen*, 763 F.3d at 1177 (where there is "no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.  [This] in turn depends on the context and design of the website and the agreements webpage.").

---

[2] Although *Nguyen* involved the application of New York law, the Ninth Circuit observed that both California and New York law dictated the same outcome.  *Nguyen*, 763 F.3d at 1175; *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (noting similarity of relevant New York and California law).

1

2

        2.   *Gonzalez-Torres Had at Least Constructive Knowledge of Zumper's Terms and Took an Affirmative Act Indicating His Agreement to Them.*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

      In the present case, Zumper offered the use of its website and the services provided thereon, but made the offer subject to acceptance of its terms.  It expressly directed the user to create an account, and it would have been impossible for the plaintiff to use Zumper's services without doing so.  Coyne Decl. ¶¶ 10, 14.  The process by which Gonzalez-Torres created an account with Zumper at the very least put him on "inquiry notice" of the Zumper terms.  As described above, the account creation process included the account creation window that, in font the same size or larger than other relevant text, expressly informed the user that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy."  Coyne Decl. ¶¶ 10-15 and accompanying screenshot.  The words "Terms and Conditions" were a hyperlink (as indicated by the blue text color), which, if clicked, took the user to Zumper's written terms.  *Id.* ¶¶ 16-17.  Those terms expressly provided that "All disputes arising out of or relating to this Agreement, the Website or the Services shall be resolved exclusively by binding arbitration . . . ."  *Id.* ¶ 39 & Ex. C.  These and other mutual promises constituted consideration.  *See Siddall v. Clark*, 89 Cal. 321, 324 (1891) ("Mutual promises are concurrent considerations, and will support each other, unless one or the other be void"); *Kinko's, Inc. v. Payne*, 901 So. 2d 354, 355 (Fla. Dist. Ct. App. 2005) ("the agreement of a party to submit to arbitration is sufficient consideration to support the other party's agreement to do the same").

20

21

22

23

24

25

      Gonzalez-Torres manifested assent to the terms.  After being presented with the language indicating that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy" and having an opportunity to read the linked terms, Gonzalez-Torres affirmatively chose to create an account.  *See* Coyne Decl. ¶¶ 15, 19.  He then proceeded to use the Zumper website to order and share his credit and background reports with a realtor for a fee.  *Id.* ¶ 24; Cmplt. ¶¶ 36-38.

26

27

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

1

2

### 3. The Second Circuit Has Held that Parties Made a Valid Contract in Nearly Identical Circumstances.

3        The means by which Zumper solicited and received Gonzalez-Torres' acceptance of the

4  terms is not uncommon in the modern digital era.  Numerous courts have enforced agreements in

5  cases presenting varying degrees of factual similarity.  In the most directly comparable appellate

6  case, applying California law the Second Circuit recently reversed a lower court and held that a

7  user had made a valid contract with Uber Technologies, Inc. when he created an account on the

8  company's mobile phone application.  *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir.

9  2017).  There the user plaintiff downloaded and installed the defendant's mobile phone

10 application, and then registered an account.  *Id.* at 70.  The account registration process involved

11 a "payment screen," on which the user was prompted to enter a credit card or select a third-party

12 payment service and click a button marked "REGISTER" to complete the process.  *Id.* at 70-71.

13 Below the "REGISTER" button, and below the options to select third-party payment services,

14 the screen included text in a smaller font stating that "By creating an Uber account, you agree to

15 the TERMS OF SERVICE & PRIVACY POLICY."  *Id.*  The capitalized terms appeared in blue

16 and were hyperlinks to the current versions of the defendant's terms of service (containing an

17 arbitration clause) and privacy policy.  *Id.*  The plaintiff claimed not to recall seeing the

18 hyperlink or reading the terms.  *Id.* at 71.

19        The Second Circuit held that the method the defendant had chosen to present and receive

20 acceptance of its terms of use provided reasonably conspicuous notice of the arbitration

21 provision and that the defendant's completion of the account creation process was an

22 unambiguous manifestation of assent.  *Id*. at 78, 80.  The court identified several design elements

23 that contributed to the notice being reasonably conspicuous and the manifestation of assent

24 unambiguous, including:

25      • The screen was uncluttered and had limited buttons, fields and text;

26      • The screen was fully visible without scrolling;

27

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

- The text notifying the user about agreement to the terms of service was clearly visible, in a color that contrasted with the background;
- The notification text appeared directly below the buttons for registration;
- The hyperlink to the terms of service was in blue and underlined; and
- The notice of the terms of service was "provided simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply."

*Id.* at 78-80; *see also id.* at 81 (screenshot of relevant screen).

Zumper's interface has nearly all of the favorable features identified by the Second Circuit. The interface is uncluttered and had just two buttons and 36 words (17 of which form the text notifying the user that creating an account signifies acceptance of the terms). *See* Coyne Decl. ¶ 11 and accompanying screenshot. The screen is fully visible without scrolling. *See id.* The text is clearly visible and in black text against a white background, with blue text used for the hyperlinks. *See id.* And the text is placed directly below the two buttons by which a user may create an account. *See id.*; *see also Meyer*, 868 F.3d at 80 ("Although the warning text used the term 'creat[e]' instead of 'register,' as the button was marked, the physical proximity of the notice to the register button and the placement of the language in the registration flow make clear to the user that the linked terms pertain to the action the user is about to take.").

Zumper's terms were, if anything, presented to Mr. Gonzalez-Torres even more clearly than Uber's terms were presented to Meyer. On the following page are reproduced, the "Create Account" screen of Zumper and the "Register" screen of Uber:

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15   *Meyer*, 868 F.3d at 81; Coyne Decl. ¶ 11.

16         With regard to viewing the "Create Account" window and the text notifying him that

17   creating an account would constitute agreement to the terms, Gonzalez-Torres had the benefit of

18   a laptop or desktop computer screen, Coyne Decl. ¶ 23, whereas the *Meyer* plaintiff's handheld

19   screen was only 5.1 inches measured diagonally, *Meyer*, 868 F.3d at 71 n.2.  More critically,

20   Zumper's text stating that "By creating a Zumper account you indicate your acceptance of our

21   Terms and Conditions and Privacy Policy" is in a much larger font and is far more legible than

22   Uber's statement that "By creating an Uber account, you agree" to its terms and privacy policy.

23   Moreover, in *Meyer*, the user had to click twice (past two webpages) to reach the terms for

24   review, *id.* at 71, whereas here Gonzalez-Torres could have reviewed the terms after a single

25   click on the terms and conditions hyperlink, Coyne Decl. ¶ 17.

26         Other differences between the two interfaces also favor Zumper.  Unlike as in *Meyer*, the

27   text warning about agreement to the Zumper terms appeared in the same size font as the other

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

relevant text, and a slightly larger size font than the text of the operative buttons.  Coyne Decl. ¶¶ 12, 15; *cf. Selden v. Airbnb, Inc.*, 2016 U.S. Dist. LEXIS 150863, *15, 26 (D.D.C. Nov. 1, 2016) (describing a notice appearing in font smaller than Zumper's as "appropriately sized"); *contrast Berkson v. GoGo LLC*, 97 F. Supp. 3d 359, 404 (E.D.N.Y. 2015) (finding statement in small size font above "NEXT" button not sufficiently conspicuous).

It is true that Zumper did not underline or capitalize the links to the terms.  But underlining is relevant only to make clear that it was a link to permit reading the terms themselves.  The fact that "Terms and Conditions" was a link was already clearly conveyed by Zumper's use of a contrasting color commonly used for the links (blue instead of black).  *See, e.g., Payne v. Amazon.com, Inc.*, 2018 U.S. Dist. LEXIS 135020, *12 (D.S.C. July 24, 2018) ("the words 'conditions of use' were in blue text indicating they were a hyperlink to the full conditions"); *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121 (Ill. App. Ct. 2005) ("A person using a computer quickly learns that more information is available by clicking on a blue hyperlink."); *see also Selden*, 2016 U.S. Dist. LEXIS 150863, at *15, 26 (enforcing link in contrasting color without underlining).  And, although *Meyer* did not rely on capitalization, to the extent it may have been a factor, it was in the context of a smaller font size in relation to neighboring text.  *See Meyer*, 868 F.3d at 78.  Here, the font size of Zumper's text relating to an agreement was the same or larger than that of neighboring text.  Coyne Decl. ¶ 15.

### 4.   District Courts in this Circuit and Elsewhere Enforce Similar Agreements.

This Court addressed a similar question in *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155 (N.D. Cal. 2016).  The Court considered three instances of users agreeing to Facebook's terms in the process of registering for accounts, and held that all three users had agreed to the terms, including a choice of law provision within those terms.  *Id.* at 1164-67.  The third user experience evaluated by the Court is the most relevant here.  In that instance, the user was asked to click a button labeled "Sign Up," with language below reading "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Use and Privacy Policy"

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

with hyperlinks to the terms.  *Id.* at 1166.  While the Court expressed some concerns about the process, it found that, under controlling Ninth Circuit precedent, the process was sufficient to form a contract because assent could be inferred from the click of the "dual-purpose" button, and because "a contract was not foisted upon [the user] simply by passively viewing a website."  *Id.*[3] The same is true here.  Gonzalez-Torres clicked on a dual-purpose button (both creating an account and indicating his assent to the terms) after being presented clear and conspicuous notice that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy" and having the opportunity to follow hyperlinks to those terms.  Coyne Decl. ¶¶ 12-17, 22.

The District Court for the District of Columbia considered another similar interface in *Selden v. Airbnb, Inc.*, 2016 U.S. Dist. LEXIS 150863 (D.D.C. Nov. 1, 2016).  In that case, the plaintiff signed up for an account with the defendant using his Apple iPhone.  *Id.* at *4-6.  The plaintiff was presented with a screen including three buttons to sign up for an account either with Facebook (as here), with Google, or with email.  *Id.* at *5.  Below the three buttons was a statement reading "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms."  *Id.*  Each of the capitalized terms appeared in red and was a hyperlink to the relevant document.  *Id.*  The terms of service included an arbitration clause.  *Id.* at *6-7.  The court held that the interface "adequately placed [the plaintiff] on notice of Airbnb's Terms of Service, and that he assented to those terms by clicking the sign-up box and using the service."  *Id.* at *14-15.  The court reasoned that the notice was placed roughly in the middle of the page, in close proximity to the sign-up buttons, in a dark font contrasting with the white background, and was "clearly legible, appropriately sized, and unobscured by other visual elements."  *Id.* at *15.  The court also reasoned that "any reasonably-observant user would notice the text and accompanying hyperlinks."  *Id.*

---

[3] The Southern District of New York reached the same conclusion when considering what appears to be the same or similar Facebook interface.  *See Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 840 (S.D.N.Y. 2012) ("[The Facebook user] was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences.  That was enough.") (cited in *Nguyen*, 763F.3d at 1177).

Zumper's presentation compares favorably to that at issue in *Selden*.  The text stating that creating an account indicates acceptance of Zumper's terms is both considerably larger in font size and closer to the button by which agreement is indicated.  *See id.* at *26 (screenshot of interface); Coyne Decl. ¶ 11.

Moving beyond the specifics of the interface at issue, the *Selden* court aptly observed that:

> The act of contracting for consumer services online is now commonplace in the American economy.  Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider.  Notifications to that effect–be they check boxes or hyperlinks–abound.  To be sure, few people may take time to actually read the user agreements.  But ignorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up for internet-based services.  So, while the record is silent as to Mr. Selden's particular history with e-commerce, the prevalence of online contracting in contemporary society lends general support to the Court's conclusion that Selden was on notice that he was entering a contract with Airbnb in this case.

*Selden*, 2016 U.S. Dist. LEXIS 150863 at *15; *see also Nicosia v. Amazon.com, Inc.*, 2019 U.S. Dist. LEXIS 100162, *51 (E.D.N.Y. June 14, 2019).  The same reasoning supports finding that Gonzalez-Torres had reasonable notice of the applicability of Zumper's terms.  Over several months, Gonzalez-Torres used the Zumper website to apply to rent various homes on three separate occasions and he paid a total of $60 to have credit, criminal history, and eviction reports generated.  Cmplt. ¶¶ 33-38; Coyne Decl. ¶¶ 24, 27.  He was not a casual internet surfer who might not anticipate making an agreement from a mere site visit.  As in *Selden*, this commercial context, in conjunction with the ubiquity of terms and conditions when using such online services, provided additional reason for Gonzalez-Torres to be on notice of Zumper's terms.  *See also Meyer*, 868 F.3d at 80 ("The transactional context of the parties' dealings reinforces our conclusion. . . . The registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions.").

1

2

### 5.   Zumper's Website Design Does Not Have the Fatal Flaws Found in Other Cases.

3

4

5

6

7

8

9

10

11

12

13

14

15

Not every website design choice, of course, has resulted in an enforceable contract.  In *Nguyen v. Barnes & Noble Inc.*, the Ninth Circuit considered so-called browsewrap agreements, and held that, by itself, Barnes & Noble's inclusion of a hyperlink to its terms at the bottom of each page did not provide users sufficient notice to create an enforceable contract because the website "otherwise provide[d] no notice to users nor prompt[ed] them to take any affirmative action to demonstrate assent." *Nguyen*, 763 F.3d at 1179.  Zumper's presentation of its terms is substantially different from the presentation at issue in *Nguyen*.  There, the defendant attempted to rely on the close proximity of the relevant hyperlinks to the buttons a user would click to complete the transaction.  *Id.* at 1177-78.  But the hyperlink was not accompanied by any language informing the user of its significance or directing the user to review the terms.  *See id.* at 1178.  The Ninth Circuit stated that "even close proximity of the hyperlink to relevant buttons users must click on – *without more* – is insufficient to give rise to constructive notice."  *Id.* at 1179 (emphasis added).

16

17

18

19

20

21

22

23

24

25

26

27

Here, there *is* more.  The relevant page expressly directed Gonzalez-Torres to "Create Account."  Zumper also advised explicitly on the same page, without scrolling, that doing so constituted assent to Zumper's terms.  And in between and in immediate proximity to those points Zumper required him to click on a button to do so.  Coyne Decl. ¶¶ 10-15.  These features gave Gonzalez-Torres reasonable notice of the applicability of the terms.  *See PDC Labs., Inc. v. Hach Co.*, 2009 U.S. Dist. LEXIS 75378, *8 (C.D. Ill. Aug. 24, 2009) (terms were conspicuous because they were brought to user's attention with the statement "STEP 4 of 4: Review terms, add any comments, and submit order," with a hyperlink to the terms) (cited favorably by *Nguyen*); *5381 Partners LLC v. Shareasale.com, Inc.*, 2013 U.S. Dist. LEXIS 136003, *23-26 (E.D.N.Y. Sept. 23, 2013) (enforcing terms where website included statement "By clicking and making a request to Activate, you agree to the terms and conditions in the Merchant Agreement" near the activation button) (cited favorably by *Nguyen*).

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

1    The First Circuit identified other design deficiencies in another case involving Uber

2    (although a different interface than that at issue in the Second Circuit's *Meyer* case discussed

3    above).  *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53 (1st Cir. 2018).  In the *Cullinane* case,

4    decided under Massachusetts law, the First Circuit reviewed two versions of screens visible in a

5    mobile phone application during the account registration process, and held that users were not

6    reasonably notified of the terms of service.  *Id.* at 62.

7    The "Link Payment" screenshot from the First Circuit's Uber case is set out below

8    alongside the Zumper "Create Account" window:

9

10      

11

12

13

14

15

16

17

18

19   *Id.* at 58; Coyne Decl. ¶ 11.

20   As seen above, there are multiple notable distinctions, several of which were the basis of

21   the First Circuit's holding that no contract had been made.  *See Cullinane*, 893 F.3d at 62-64.

22   • Whereas the *Cullinane* plaintiffs saw the interface on a small 3.5 inch iPhone screen, Mr.

23      Gonzalez-Torres saw the Zumper interface on a much larger desktop or laptop screen.

24   • The key words advising the user that a contract was contemplated are presented very

25      differently.  For the *Cullinane* plaintiffs, the operative words "By creating an account

26      Uber account, you agree to the" terms of service and privacy policy appeared on a single

27      line in a dark gray font on a black background, at the opposite end of the screen from the

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

box where the user would take the affirmative act of entering a credit card number and clicking on a "Done" button in the upper right corner that appeared when the box was populated. *Id.* at 59. That dark gray text was less noticeable than the links to the terms of service and privacy policy. *Id.* at 64. In contrast, Zumper's operative text, "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy," occupied two lines directly below the two buttons to proceed and was in a larger font (15px) than the text of the buttons (14px) in a black font against a white background. Coyne Decl. ¶¶ 11, 15; *contrast Berkson*, 97 F. Supp. 3d at 374, 404 (second "sign in" button appeared in upper right-hand corner of page, divorced from notice and hyperlinks).

- Zumper's link to its terms was in blue and thus had the common appearance of a hyperlink; Uber's terms were in white, and did not. *Cullinane*, 893 F.3d at 63; *cf. Payne*, 2018 U.S. Dist. LEXIS 135020, at *12 (enforcing non-underlined blue hyperlinks).

The Zumper design at issue here is thus comparable to those designs that the courts have held sufficient to bind website or mobile phone application users to the terms and conditions presented. Gonzalez-Torres had clear notice when he created his account that "By creating a Zumper account [he] indicate[d] [his] acceptance of [Zumper's] Terms and Conditions and Privacy Policy." He proceeded to create and use an account. Therefore, a contract was offered and accepted. The mutual promises of the parties gave rise to consideration. Gonzalez-Torres must adhere to the terms of the contract, including the arbitration clause contained therein.

### C.   The Plaintiff Reaffirmed His Agreement to the Terms in May 2018.

Gonzalez-Torres again agreed to Zumper's terms on May 10, 2018 when he signed into his Zumper account. Zumper's records show that Gonzalez-Torres at that point unsuccessfully attempted to sign in using the "Continue with Facebook" button; however, Zumper's system does not allow users who have already created an account and password to sign in using Facebook. Coyne Decl. ¶¶ 28, 30. Therefore, as shown on the next page, Gonzalez-Torres was shown an error message reading "A user with this email already exists." *Id.* ¶ 30. Lower on the

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

1   page of that message, a sentence reading "Already a member?  Sign In," appeared immediately

2   below the language noting that creation of an account constituted agreement to the terms.  *Id.*

3   After clicking "Sign In," Gonzalez-Torres would have been taken to a new window and

4   proceeded to enter his email address and the password he created on February 27, 2018.  *Id.* ¶¶

5   31-32.



16   *Id.* ¶ 30 and accompanying screenshot.  After signing in, Gonzalez-Torres used the Zumper

17   website to share another rental application.  *Id.* ¶ 27.

18          This sequence of events demonstrates that Gonzalez-Torres was (or certainly should have

19   been) aware that he had created an account, and was reminded that he had agreed to Zumper's

20   terms by creating that account, but nonetheless chose to sign in to his account and use the

21   Zumper website to make another transaction.  By doing so, he reaffirmed his agreement to

22   Zumper's terms, including the arbitration clause therein.  Gonzalez-Torres, moreover, used the

23   site again and purchased an additional set of reports on July 11, 2018, when the same screens and

24   relevant terms were in place.  Coyne Decl. ¶¶ 27, 34, 39-41.

25   **III.       THE AGREEMENT TO ARBITRATE COVERS THE PLAINTIFF'S
             CLAIMS.**

26

27          Gonzalez-Torres' claims fall within the scope of the arbitration clause.

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY
PROCEEDINGS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.    Any Objection to the Scope of Arbitration Must Be Submitted to the Arbitrator.

First, any objections Gonzalez-Torres might have as to including his present claims within the scope of the arbitration clause must be presented to the arbitrator.  The arbitration clause in Zumper's terms delegates all issues, including the question of arbitrability, to the arbitrator.  The agreement does so by explicitly incorporating the Commercial Arbitration Rules of the American Arbitration Association.  *See* Coyne Decl. ¶ 39 & Ex. C. ("All disputes . . . shall be resolved . . . in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the 'AAA') then in effect"); *see also id.* Ex. E (Rule R-7).  These rules specifically provide that:  "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  *Id.* Ex. E (Rule R-7(a)).  "[I]ncorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability."  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

### B.    The Claims Are Plainly Within the Scope of the Arbitration Clause.

Second, and in any event, while the issue has been delegated to the arbitrator, the present claims are plainly arbitrable.  The Arbitration Clause of the Terms of Use provides:  "All disputes arising out of or relating to this Agreement, the Website or the Services shall be resolved exclusively by binding arbitration . . . ."  Coyne Decl. ¶ 39 & Exs. C & D.  The covered "Services" specifically include authorizing parties listing rental real estate (including "brokers") to "obtain through services provided by one of our third party service providers a copy of your consumer credit score, as well as background investigations regarding your criminal and eviction history."  *Id.* ¶ 41 & Ex. C, §§ 4, 7.  All of Gonzalez-Torres' claims arise out of and relate to his use of the Zumper website to respond to requests from a real estate agent, Leo Sanchez, for Gonzalez-Torres' credit and background reports.  *See* Cmplt. ¶¶ 33-37, 60-62.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

1
2

**IV.      THE FAA MANDATES THAT THIS ACTION BE STAYED PENDING ARBITRATION.**

3

Section 3 of the FAA provides that, if the dispute is subject to arbitration, the court

4

"shall" "stay the trial of the action until such arbitration has been had."  9 U.S.C. § 3.  As with

5

the order compelling arbitration under Section 4, the stay under Section 3 is mandatory.  *See*

6

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  As shown above, Gonzalez-

7

Torres' claims must be arbitrated pursuant to the terms of the agreement he made with Zumper.

8

Accordingly, this Court should stay the proceedings pending the outcome of this motion and any

9

subsequent arbitration.

10

**CONCLUSION**

11

For the reasons stated above, defendant Zumper, Inc. respectfully requests that the Court

12

enter an order staying this case pending the resolution of this motion and any subsequent

13

arbitration pursuant to the parties' agreement and the Federal Arbitration Act, 9 U.S.C. §§ 1 *et*

14

*seq.*

15

16

DATED:  June 17, 2019                                    Respectfully Submitted,

17

18                                             By:      /s/ John A. Shope
John A. Shope (admitted pro hac vice)
Kevin J. Conroy (admitted pro hac vice)

19                                                      **FOLEY HOAG LLP**

20                                                      155 Seaport Boulevard
Boston, MA 02210-2600

21                                                      Telephone: (617) 832-1000
Facsimile: (617) 832-7000

22                                                      jshope@foleyhoag.com
kjconroy@foleyhoag.com

23

24

25

26

27

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

David M. Goldstein (SBN 142334)
David C. Brownstein (SBN 141929)
Charles R. Jaeger (SBN 171039)
**FARMER BROWNSTEIN**
**JAEGER & GOLDSTEIN LLP**
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 795-2050
Facsimile: (415) 520-5678
dgoldstein@fbj-law.com
dbrownstein@fbj-law.com
cjaeger@fbj-law.com

Attorneys for Defendant Zumper, Inc.

Case No. 4:19-cv-2183-PJH

DEFENDANT'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS