JOHN A. SHOPE (admitted *pro hac vice*)
KEVIN J. CONROY (admitted *pro hac vice*)
**FOLEY HOAG LLP**
155 Seaport Boulevard
Boston, MA 02210
Telephone: (617) 832-1000
Facsimile: (617) 832-7000
jshope@foleyhoag.com
kjconroy@foleyhoag.com

DAVID M. GOLDSTEIN (State Bar No. 142334)
DAVID C. BROWNSTEIN (State Bar No. 141929)
CHARLES R. JAEGER (State Bar No. 171039)
**FARMER BROWNSTEIN JAEGER & GOLDSTEIN LLP**
235 Montgomery Street, Suite 835
San Francisco, CA 94104
Telephone: (415) 795-2050
Facsimile: (415) 520-5678
dgoldstein@fbj-law.com
dbrownstein@fbj-law.com
cjaeger@fbj-law.com

Attorneys for Defendant
ZUMPER, INC.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| LUIS ARMANDO GONZALEZ-TORRES, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZUMPER, INC.,<br><br>Defendant. | **Case No. 4:19-cv-2183-PJH**<br><br>PROPOSED CLASS ACTION<br><br>[Assigned to the Hon. Phyllis J. Hamilton]<br><br>**DECLARATION OF BRIAN COYNE IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>**Hearing Date and Time:**<br>**Date:** July 31, 2019<br>**Time:** 9:00 a.m.<br>**Courtroom:** 3<br><br>**Complaint Filed:** April 23, 2019<br>**Trial Date:** None |

# DECLARATION OF BRIAN COYNE

I, Brian Coyne, affirm that the following statements are true and correct as a matter of my personal knowledge:

1. I am over the age of 18 and am the Chief Business Officer at Zumper, Inc. ("Zumper").

2. Zumper is a corporation organized under the laws of Delaware, and has its principal place of business in San Francisco, California. Through its website (www.zumper.com, the "Zumper Website"), Zumper provides a marketplace throughout the United States and Canada in which prospective renters can search for rental apartments and connect with landlords and realtors offering rental apartments. The Zumper Website can also be used by landlords and realtors to communicate with and evaluate prospective tenants. When requested by prospective tenants, Zumper obtains credit, criminal and eviction reports from third parties for transmission to prospective landlords.

3. I have personal knowledge regarding the appearance and function of the Zumper Website as it has appeared since February 2018 (and earlier). I also have personal knowledge of the operation of the systems through which user information is submitted to Zumper and stored by Zumper, including the process for creating new user accounts. Zumper subscribes to a service that maintains a repository of the Zumper Website as it has appeared in the past.

4. In order to use certain features of the Zumper Website, including submitting rental applications and requesting and sharing credit, criminal, and eviction reports, a user has had to create a Zumper account.

5. I have reviewed the complaint in this action and understand that plaintiff Luis Armando Gonzalez-Torres alleges that, in February 2018, he was seeking to rent a home, and that the listing agent with whom he was working sent Mr. Gonzalez-Torres a link to the Zumper Website in order to provide a credit report and background check (Complaint ¶¶ 33-35).

6.  I further understand that Mr. Gonzalez-Torres alleges that he "went to Zumper's website and created a rental application" and that he then submitted the application, "which included a Zumper Screen report" (Complaint ¶¶ 36-37).

7.  As explained further in Paragraphs 19-32 below, Zumper's records indicate that, starting on February 27, 2018 and continuing through May and July of that year, Mr. Gonzalez-Torres created an account on the Zumper Website, created rental applications, including requests for credit, criminal history and eviction reports, and then shared those applications with a Florida realtor named Leo Sanchez for the purpose of pursuing prospective residential rentals in the Miami and Orlando, Florida areas.

8.  Zumper's system allows realtors such as Mr. Sanchez to send prospective tenants links to customized pages on the Zumper Website to begin the application process. If, as is likely, Mr. Sanchez sent Mr. Gonzalez-Torres such a link, and Mr. Gonzalez-Torres followed that link, Mr. Gonzalez-Torres would have reached a page on the Zumper Website that invited him to "Send a Credit Report & Rental Application to Leo Sanchez" with a pink button reading "Apply Now."

9.  A screenshot showing approximately how that website would have appeared to a user on a laptop or desktop computer with a browser window in landscape orientation[1] appears on the following page. Mr. Gonzalez-Torres could have seen additional material, not shown in this screenshot, by scrolling down on the website. It would not have been necessary to scroll down or view the additional material to create an account or to create and share a rental application and credit, criminal history and eviction reports.

---

[1] As indicated in Paragraph 23, below, Mr. Gonzalez-Torres used a computer running the Windows 10 operating system when he created an account. The screenshots in Paragraph 9 and 11 were created using a computer with a screen and browser window in landscape orientation.



10. If Mr. Gonzalez-Torres clicked on the pink "Apply Now" button on that webpage, a pop-up window directing him to "Create Account" would have appeared.[2]

11. A screenshot showing how the "Create Account" pop-up window would have appeared to Mr. Gonzalez-Torres using a laptop or desktop computer with a browser window in landscape orientation appears on the following page[3]:

---

[2] It is conceivable, but not likely, that Mr. Gonzalez-Torres created his account not by conveniently following the link provided by Mr. Sanchez and clicking the "Apply Now" button on the resulting webpage, but instead by going to the Zumper Website home page and independently navigating to the "Create Account" pop-up window.  But whichever way Mr. Gonzalez-Torres came to submit his rental application, he would have had to create an account. He would not have been able to create an account without encountering the "Create Account" pop-up window shown in Paragraph 11.

[3] Even if Mr. Gonzalez-Torres were using a browser window in portrait orientation, the appearance of the "Create Account" pop-up window would have been approximately the same as shown in Paragraph 11, because the "Create Account" pop up window itself is presented in portrait orientation.



12. The text of "Create Account" was in black, 15 px font on a very light gray field. Below that field, against a white field, the "Create Account" pop-up window offered users two means by which to create a Zumper account. Users could enter their name, email address and a password and then click on a blue button labeled "Create Account," or they could create a Zumper account using the information from an existing Facebook account by clicking a white button labeled "Continue with Facebook" (both buttons appeared in a 14 px, semi-bold font). Zumper's internal records indicate that Mr. Gonzalez-Torres chose the latter option.

13. When users clicked the button to create an account using Facebook, they were taken to a new window, where they were prompted to enter the login credentials associated with their Facebook account. The users were then informed of the information that Zumper would receive and asked to confirm that they wanted to continue. Upon taking these steps, the user had created an account and Zumper received the user's name and email address to associate with the user's Zumper account.

14. If Mr. Gonzalez-Torres had not created an account, he would not have been able to use features of the Zumper Website such as requesting and sharing credit, criminal, and eviction reports, or submitting a rental application.

15. Below the buttons to create an account, in a third field, the following language was visible without scrolling: "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy." This language appeared in size 15 px font, larger than the text of the buttons above it, which, as noted, appeared in size 14 px font.

16. The words "Terms and Conditions" and "Privacy Policy" were blue to indicate that they were hyperlinks. With the exception of the "X" in the upper right-hand corner to close the window without creating an account (and the space outside the window, which would also close the window), all of the elements that could be clicked to take the user out of the window appeared in blue (*i.e.*, the two buttons, the "Terms and Conditions" hyperlink, the "Privacy Policy" hyperlink, and the "Sign In" hyperlink).

17. Once Mr. Gonzalez-Torres clicked on "Terms and Conditions," his browser would have been redirected to another page on the Zumper Website (www.zumper.com/terms-of-use), where he could have read Zumper's Terms of Use. As of February through July 2018, a link to the Terms of Use also appeared at the bottom of every page on the Zumper Website.[4]

18. It was Mr. Gonzalez-Torres' choice whether or not to read the Terms of Use when creating an account. But whether or not he chose to read those terms, he could not create an account until he had proactively decided to click on either one of the buttons appearing above the language noting acceptance of the terms and conditions and the hyperlink to those terms.

19. Zumper's internal records indicate that a user with the name "Luis Gonzalez" created an account on the Zumper Website on February 27, 2018. Attached as Exhibit A is a true and accurate copy of a screenshot from Zumper's internal records showing that user's account

---

[4] Likewise, once Mr. Gonzalez-Torres clicked on "Privacy Policy," his browser would have been redirected to another page on the Zumper Website (www.zumper.com/privacy-policy), where he could have read Zumper's Privacy Policy. As with the Terms of Use, as of February through July 2018, a link to the Privacy Policy also appeared at the bottom of every page on the Zumper Website.

1  information.  Attached as Exhibit B is a true and accurate copy of a screenshot from Zumper's
2  internal records showing that user's account creation and activity on the Zumper Website.
3       20.     The user about whom Exhibits A and B relate is the plaintiff, Mr. Gonzalez-
4  Torres.  Zumper's records show that this user communicated with Zumper's customer service by
5  email later on February 27, 2018, using the same email address associated with the account.  The
6  content of those communications is consistent with the communications that the plaintiff alleges
7  that he had with Zumper's customer service.
8       21.     Exhibit A shows that Mr. Gonzalez-Torres' account has a username of
9  mbh69MxD8L6ozxO4Mr9GyuMnzr3W.  This is a username that was automatically generated
10 by Zumper to ensure that every user had a distinct username.  It was not selected by Mr.
11 Gonzalez-Torres.
12      22.     The entry on Exhibit B with the event "web:fb_signup" indicates that that Mr.
13 Gonzalez-Torres created his account on February 27, 2018 at 11:36 a.m. Pacific Standard Time.
14 This entry shows (in the "user" column) that Mr. Gonzalez-Torres was assigned a user_id of
15 4791110.  As with the username described in Paragraph 21, above, this was an automatically
16 generated, unique value.  It would not have been chosen by Mr. Gonzalez-Torres.
17      23.     This entry also provides information about Mr. Gonzalez-Torres' activity on the
18 Zumper Website in the column titled "data."  Based on this information (specifically, the
19 notations "Windows NT 10.0; Win64; x64"), I can determine that Mr. Gonzalez-Torres was
20 using a computer with the Windows 10 operating system when he created his account.
21      24.     Three entries on Exhibit B with the events "zapp:ShareReport,"
22 "zapp:ShareApplication," and "api:share_docs" indicate that that Mr. Gonzalez-Torres shared his
23 credit, criminal, and eviction reports and a rental application with another user
24 ("mi_realtor_leo@att.net") on February 27, 2018 at 13:34 (1:34 p.m.) Pacific Standard Time,
25 approximately two hours after having created an account.  According to Zumper's records, that
26 user is realtor Leo Sanchez.  During this process, Mr. Gonzalez-Torres was required to create a
27 password that Zumper used to encrypt and protect his credit, criminal, and eviction reports.  That
28

day, Mr. Gonzalez-Torres paid $30 to share his credit, criminal, and eviction reports and rental application.

25. Exhibit B shows that Mr. Gonzalez-Torres created his account and shared his rental application and credit, criminal eviction reports from the IP address 98.203.12.221, which I understand to be associated with an internet service provider located in Miami, Florida.

26. According to Zumper's records, the three properties listed by Mr. Sanchez about which Mr. Gonzalez-Torres inquired in February 2018 were located in Hialeah, Florida. Mr. Gonzalez-Torres used the Zumper Website to send additional inquiries to other realtors about other properties in the greater Miami and Orlando, Florida areas.

27. Exhibit B also shows that Mr. Gonzalez-Torres accessed the Zumper Website and shared rental applications with Leo Sanchez on two additional occasions – May 10, 2018 and July 11, 2018. On each occasion, Mr. Gonzalez-Torres would have had to sign in to his Zumper account if he was not already signed in. Mr. Gonzalez-Torres again paid $30 to share his application on July 11, 2018.

28. Exhibit B (specifically, the May 10, 2018 entry with the event "web:fb_signup_assoc_req") indicates that Mr. Gonzalez-Torres was not already signed in when he accessed the Zumper Website on May 10, 2018, because he unsuccessfully attempted to sign in using a Facebook account. I am not able to tell from Zumper's records whether Mr. Gonzalez-Torres was already signed in when he accessed the Zumper Website on July 11, 2018. Whether or not he remained signed in would depend on the settings of his device and browser.

29. When Mr. Gonzalez-Torres accessed the Zumper Website on May 10, 2018, if, as is likely, he followed a link provided by his realtor, Leo Sanchez, he would have seen the same web page shown in Paragraph 9, above. On that webpage, if Mr. Gonzalez-Torres clicked the pink "Apply Now" button, he would have been taken back to the "Create Account" pop-up window.

30. Because he had already created a Zumper account and selected a password to encrypt his and protect his credit, criminal, and eviction reports, Mr. Gonzalez-Torres would not

have been able to select the "Continue with Facebook" button. When he attempted to do so, as Zumper's records indicate he did, he would have been shown a red error message in the "Create Account" window reading, "A user with this email already exists." A screenshot showing the appearance of that error message appears below:



31. From there, in order to sign in, he would have had to click the blue hyperlink labeled "Sign In" within the statement "Already a Member? Sign In" at the bottom of the window. Mr. Gonzalez-Torres would have then seen a new pop-up window labeled "Sign In to Zumper" that prompted him to sign in with his email address and the password he created on February 27, 2018.

32. A screenshot showing the appearance of the "Sign In to Zumper" pop-up window as it appeared on May 10, 2018 appears on the following page[5]:

---

[5] Although Mr. Gonzalez-Torres used a computer with the Windows operating system to create his account on February 27, 2018, Zumper's records indicate that on May 10, 2018 Mr. Gonzalez-Torres used an iPhone with the Safari browser. The specific record is the entry "ua=Mozilla/5.0 (iPhone; CPU iPhone OS 11_3 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/11.0 Mobile/15E148 Safari/604.1" on Exhibit B. Zumper's records do not indicate the precise model or screen size of the iPhone he used. The screenshot in Paragraph 32 was created using an iPhone XS, with a 5.8 inch screen (measured diagonally). Other iPhone models have screen sizes ranging from 3.5 inches to 6.5 inches. Even on an iPhone with a 3.5 inch screen, the entire "Sign in to Zumper" pop-up window would have been visible without scrolling. Similarly, the entire "Create Account" pop-up window, including the text at the bottom reading "Already a Member? Sign In" would have been visible without scrolling, regardless of the model of iPhone used.



33. It is possible that Mr. Gonzalez-Torres, instead of clicking the pink "Apply Now" button, clicked on the "Sign In" button at the top of the Zumper Website, either after following a link provided by Leo Sanchez, or navigating to the Zumper Website independently. But even if he did so, he still would have seen the same "Sign In to Zumper" pop-up window shown in Paragraph 32, above.

34. The appearance of the "Create Account" and "Sign In to Zumper" windows remained the same from February 27, 2018 through July 11, 2018.

35. By creating an account on February 27, 2018, Mr. Gonzalez-Torres necessarily agreed to the terms and conditions posted on the website at that time.

36. Attached as Exhibit C is a true and correct copy of Zumper's Terms of Use as they existed on February 27, 2018 and May 10, 2018.

37. Zumper's Terms of Use were changed slightly in May 2018. The May 2018 revision became effective on May 14, 2018 and was available as of that that date for users such as Mr. Gonzalez-Torres to view at www.zumper.com/terms-of-use. The May 2018 revised terms remained effective and available to users through July 11, 2018.

38. Attached as Exhibit D is a true and correct copy of Zumper's Terms of Use as they existed on July 11, 2018.

39. Zumper's arbitration clause was not changed by the amendment made in between Mr. Gonzalez-Torres' visits in May and July of 2018. Section 14 of Zumper's Terms of Use, as they existed on February 27, 2018, May 10, 2018, and July 11, 2018, provided:

> All disputes arising out of or relating to this Agreement, the Website or the Services shall be resolved exclusively by binding arbitration before a single arbitrator (the "Arbitrator") in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") then in effect (for information on the AAA and its rules, see www.adr.org.) and the further procedures set forth herein, except that each party retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights. The arbitration shall be conducted in San Francisco, California, unless the Arbitrator shall determine that that venue is not reasonably convenient to all parties, in which case the Arbitrator shall determine another venue that is. In the event that the AAA is unavailable or unwilling to administer the arbitration, and the parties are unable to agree to a substitute, a substitute shall be appointed by the court. The Arbitrator shall have authority to issue any and all remedies authorized by law. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 2 et seq. Notwithstanding any rules of the AAA to the contrary, any claims shall be adjudicated on an individual basis only, and YOU WAIVE ANY RIGHT TO BRING ANY CLAIM AS A REPRESENTATIVE OF A PROPOSED CLASS, ON AN AGGREGATED OR MASS BASIS, OR AS A PRIVATE ATTORNEY GENERAL, OR TO CONSOLIDATE ARBITRATION PROCEEDINGS WITHOUT THE CONSENT OF ALL PARTIES THERETO. Any award rendered by the Arbitrator shall be final, conclusive and binding upon the parties hereto. In connection with any arbitration proceeding pursuant to this Agreement, unless the Arbitrator shall determine otherwise, each party shall bear its own costs and expenses. Notwithstanding the foregoing, you may at your option file an individual claim in any small claims court for disputes or claims within the scope of its subject matter jurisdiction if such court has personal jurisdiction. Zumper does not hereby waive any defense that such jurisdiction may be lacking in your state. Without derogation of the parties' obligation to arbitrate as set forth herein, for any claims other than those in small claims court,

jurisdiction for any court proceedings arising out of or relating to this Agreement, the Website or the Services shall be vested exclusively in, and venue shall be laid in, the state or federal courts sitting San Francisco, California except that, following confirmation of an arbitration award in a state or federal court in San Francisco, California, a judgment arising therefrom may be executed in any court of competent jurisdiction.

40.   Section 1 of the Terms of Use, as they existed on February 27, 2018, May 10, 2018, and July 11, 2018, defined "Services" as "the Zumper online real estate marketplace, including the Zumper Pro service and the Zumper Select service, offered through the Website."

41.   Section 7 of the Terms of Use, as they existed on February 27, 2018, May 10, 2018, and July 11, 2018, further specified that requesting and sharing credit, criminal, and eviction reports, as Mr. Gonzalez-Torres did on February 27, 2018, was part of the "Services" as defined by the Terms of Use, providing:

> You understand that you may (i) submit electronic instructions through the Services to a Listing Party authorizing such Listing Party to obtain through services provided by one our third party service providers a copy of your consumer credit report and score, as well as reports of background investigations regarding your criminal and eviction history as each relates to your suitability as a tenant, or (ii) submit consent to a request from a Listing Party that it be authorized to so obtain such credit report and score or background investigation . . .

42.   Attached as Exhibit E is a true and accurate copy of the current Commercial Arbitration Rules of the American Arbitration Association, which are available at https://adr.org/sites/default/files/CommercialRules_Web.pdf.

I declare under the penalty of perjury that the foregoing statements are true and correct, and that I signed this declaration in ___SAN FRANCISCO, CA___, on June 17, 2019.

_____
Brian Coyne

Case No. 4:18-cv-2183-PJH
DECLARATION OF BRIAN COYNE IN SUPPORT OF MOTION TO COMPEL ARBITRATION
11